Gerard J. SHERIDAN

v.

The MCGRAW–HILL COMPANIES, INC., Defendant.

No. 99 Civ. 8716(NRB).

United States District Court, S.D. New York.

Jan. 30, 2001.

As Amended February 13, 2001.

---

Stanley N. Futterman, New York City, for plaintiff.

Gregory I. Rasin, Valerie K. Wilde, Jackson Lewis Schnitzler & Krupman, New York City, for defendant.

## OPINION AND ORDER

BUCHWALD, District Judge.

Plaintiff Gerard J. Sheridan ("Sheridan" or "plaintiff") brings this action alleging that the termination of his employment by McGraw–Hill Publishing ("McGraw–Hill" or "Defendant") was an unlawful act of age discrimination that violated the Age Discrimination in Employment Act ("ADEA"), *see* 29 U.S.C. § 633(1). Plaintiff further alleges that his written waiver of any

ADEA claims against McGraw–Hill was not knowing and voluntary under the terms of the Older Worker Benefit Protection Act ("OWBPA") amendments to the ADEA, codified at 29 U.S.C. § 626(f)(1). Pursuant to this Court's supplemental jurisdiction, *see* 28 U.S.C. § 1367, plaintiff also asserts that both his discharge and waiver were unlawful under New York State and New York City law. *See* New York Human Rights Law, N.Y. Exec. Law §§ 296(1)(a), (3–a); Administrative Code of the City of New York § 8–107(1)(a).

Now pending is defendant's motion for summary judgment. For the following reasons, defendant's motion is granted.

## BACKGROUND

### A. Facts

In considering this summary judgment motion, all facts are construed most favorably to the plaintiff.[1] Gerard Sheridan was employed by the McGraw–Hill Companies, Inc., in New York City from June 1973 through May 1989, and again from October 1990 through July 9, 1998.[2] *See* Complaint ("Compl."), ¶ 5. In 1992, he was promoted to the position of Director of Retail Brokerage Finance for the Standard & Poor's ("S & P") division of McGraw–Hill, which was his final position in defendant's employ. *See id.;* SOUF, at ¶ 3.

Plaintiff reported to S & P's Retail Finance Group's Controller, Alan Waller, and had responsibility for various financial reporting and forecasting activities. *See* Sheridan Aff., at ¶ 12, Exh. 9. Plaintiff was responsible for financial support services for the retail services group, S & P's Index Services, Investment Advisory Services,

and, at varying times, other S & P business ventures. *See* Sheridan Aff., at 12. Plaintiff avers that his supervisors never communicated anything other than satisfaction with his work. *See* Sheridan Aff., ¶¶ 10, 12.

In 1997, the Retail Division, which included such business units as S & P's Retail Brokerage and the various well-known S & P Indices, was reorganized. *See* SOUDF, at ¶¶ 10–15. Some business units were split into independent units, while others were combined, and still other new business units were acquired. *See id.* At the end of this process, a newly created position of Vice President of Finance was filled by Del Johnson to provide coordinated financial information and support to the growing Retail Division. *See* SOUDF ¶¶ 16, 26.

On March 10, 1998, Sheridan met with Del Johnson, who was now the supervisor of Sheridan's direct supervisor, Controller Alan Waller. *See* Sheridan Aff., ¶ 3. Johnson informed Sheridan that he was being terminated and provided him with a memorandum dated March 9, 1998. *See* Sheridan Aff., Exh. 1. This memo stated that "[T]he Company has decided to reorganize the Retail Division Finance group in order to be more responsive to the business groups [sic] needs. As a result of this reorganization, your position as a Director is eliminated effective April 3, 1998. This is not a reflection on you. In the time that you have been with Standard and Poor's, you have made meaningful contributions to the Company." *Id.*

The termination memorandum indicated that plaintiff would receive six weeks no-

---

1. Defendant submitted a statement of undisputed facts pursuant to Local Civil Rule 56.1, and plaintiff submitted a "Statement of Disputed Facts" (hereinafter "SOUDF") in response, which identified items in defendant's statement with which plaintiff took issue. It is thus presumed that all other facts in defendant's 56.1 statement are admitted by plaintiff.

2. Plaintiff was terminated in 1989 as part of a reorganization and relocation of positions, and was rehired shortly thereafter. *See* Sheridan Affidavit ("Sheridan Aff."), at ¶ 17. At that time, plaintiff received a severance package and signed a release. *See* SOUDF, ¶ 52. Approximately five months after his March, 1998 termination, plaintiff was rehired a second time by McGraw–Hill, as a Temporary Estimator in its Corporate Manufacturing department. *See id.,* at ¶ 7.

tice of his discharge, a severance payment of $25,967,20.00, and various other benefits. *See* SOUDF, at ¶ 43. Plaintiff subsequently met with Robert Temme, Director of Human Resources, who advised plaintiff regarding the possibilities of obtaining another position within the Mc–Graw Hill Companies. *See* SOUDF, at ¶ 45. Mr. Temme also informed plaintiff that he would attempt to negotiate more favorable severance terms in exchange for Mr. Sheridan's agreement to sign a waiver and release of any claims against the company stemming from the termination. *See id.,* at ¶ 46.

A March 26, 1998 letter stated the details of such an enhanced benefits package, as well as the terms of the waiver and release. *See* Rasin Affidavit, ("Rasin Aff."), Exh. G. This letter offered Sheridan an additional $21,972.74 of consideration, as well as $7000.00 in professional outplacement services. *See* SOUDF, at ¶ 43. Temme explained the details of the proposed agreement in laymen's terms. *See id.,* at ¶ 48. The agreement included provisions that instructed plaintiff to consult with an attorney prior to signing it, that he would have twenty-one days to consider the agreement, and that he could revoke his acceptance of it within seven days after its execution. *See id.,* at ¶ 50.

Plaintiff then in fact consulted with counsel prior to executing the agreement on the twenty-first day after receiving it. *See* Sheridan Aff., at ¶ 14; SOUDF, at ¶¶ 53–54, 57. It is further undisputed that plaintiff was concerned—before he executed the waiver agreement—that his job might be at risk because of his age. *See* SOUDF, at ¶¶ 65–66.

After plaintiff's termination, an individual named Marge Kondoleon was hired as "Controller, Retail Services" at a co-equal level to Controller Alan Waller, plaintiff's former supervisor, whose job title was changed in the reorganization. *See* Sheridan Aff., Exh. 8. Both of these individuals now reported to an individual named Philippe Liautaud, who was employed as "Controller". *See id.* As a result of the reorganization, each business unit was supported by an individual financial services officer.

### B. Summary Judgment Standard

Summary judgment is properly granted " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' " *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, the district court must assess the evidence in "a light most favorable to the nonmoving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *American Casualty Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nonetheless, the non-moving party must affirmatively set forth at least some facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

### DISCUSSION

### A. Legal Standard for Waiver of ADEA Claims

Waivers of ADEA claims are governed by the OWBPA. *See* 29 U.S.C. § 626(f). This statute provides that any waiver of rights or claims under the ADEA must be "knowing and voluntary" in order to be effective. *Id.* The Congressional policy behind the OWBPA is

clear; Congress removed waivers of ADEA claims from the general realm of contract law and imposed specific statutory strictures on such waivers. *See Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426–27, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998).

Among the requirements of the OWBPA regime are provisions that such waivers be written in ordinary language, *see* § 626(f)(1)(a); that the waiver specifically refers to the rights being waived as rights arising under the ADEA, *see* § 626(f)(1)(b); that the waiver is executed only in exchange for consideration in addition to whatever the employee may already be entitled, *see* § 626(f)(1)(d); that the individual is advised in writing to consult with an attorney, *see* § 626(f)(1)(e); that the employee is given at least twenty-one days within which to consider a proposed waiver, *see* § 626(f)(1)(f)(i); and that the waiver agreement allows the employee a period of seven days following execution of the agreement within which to revoke acceptance without penalty, *see* § 626(f)(1)(g).

█ There is little doubt that both statutory and case law require that when older workers bargain away their statutory right to be free from age discrimination, such waivers must meet an exacting standard of knowledge and voluntariness. *See, e.g., Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 403 (2d Cir.1989). In a time of widespread downsizing and reorganization, Congress has acted clearly and unequivocally to protect the rights of older workers. *See* 1990 U.S.C.C.A.N. 1509 (S.Rep. No. 101–263).

**B. Sheridan's Waiver Agreement**

█ It is undisputed that the waiver and release executed by Sheridan on April 15, 1998 complied with all the explicit statutory commands, and that McGraw–Hill met all its statutory obligations under the OWBPA. See Rasin Aff., Exh. G, at ¶¶ 8–11. Furthermore, it is uncontroverted that plaintiff in fact consulted counsel in considering whether to execute the waiver. *See* SOUDF, at ¶ 54. There is also little doubt about plaintiff's competency to enter into such a waiver. Sheridan graduated Mercer County Community College with an Associate's degree in Accounting, and graduated the College of New Jersey with a Bachelor of Science degree in business administration. *See id.*, at ¶ 51. He held responsible positions involving financial management and oversight. It is apparent that such positions require that he possess a sophisticated understanding of business transactions, and the capacity to read and comprehend a document such as the proposed waiver agreement.

A plain reading of plaintiff's waiver and release of claims reveals that it precludes the filing of this lawsuit. The waiver agreement stated in relevant part:

> In consideration for the payments and benefits furnished you hereunder by McGraw–Hill, including the special consideration ... you hereby release and discharge McGraw–Hill and its subsidiary corporations and their officers and employees from all claims, causes of action, suits, agreements and damages which you or your legal representative may have now or in the future against McGraw–Hill arising in connection with your employment by McGraw–Hill or the termination thereof, including but not limited to any claims or causes of action you ever had or now have under the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act of 1990 ..., state age laws, federal or state retirement or discrimination laws, civil right laws, and all other federal and state laws regarding employment. By executing this agreement, you hereby agree that you will not initiate or maintain any proceedings in any judicial or administrative forum ... relating to any matters covered by this Agreement other than to seek enforcement of its terms.

SOUDF, ¶ 49. The language of that agreement could not be more clear, and plaintiff does not contest that he understood its import at the time he executed the agreement. *See* Sheridan Aff., at ¶ 14.

## C. Defendant's Alleged Fraudulent Misrepresentations

Despite all the foregoing—despite plaintiff's professed understanding of the waiver, despite his consultations with counsel, despite the detailed statutory requirements of the OWBPA, and despite McGraw–Hill's compliance with those requirements, plaintiff nonetheless asserts that his waiver and release was not knowing and voluntary under the terms of the OWBPA. Such an assertion strains credulity, and we find that even with a reading of the facts most charitable to plaintiff, his waiver, as a matter of law, was knowing and voluntary.

■ Plaintiff contends that McGraw–Hill deliberately misrepresented the facts surrounding his discharge so as to fraudulently induce him to sign the waiver and release of claims. Plaintiff is correct that the OWBPA requirements set out in § 626(f) are only minimum requirements to find a waiver knowing and voluntary, and that the ultimate test remains whether that waiver was *in fact* knowing and voluntary. Thus, a waiver that complies with OWBPA requirements but in other respects creates a climate of duress, for example, would not be knowing and voluntary.

The Equal Employment Opportunity Commission has promulgated regulations that render this apparent. *See* 29 C.F.R. § 1625.22. These regulations note, in relevant part, that the OWBPA amendments to "the ADEA set out the minimum requirements for determining whether a waiver is knowing and voluntary," and that "[o]ther facts and circumstances may bear on the question of whether the waiver is knowing and voluntary, as, for example, if there is a material mistake, omission, or misstatement in the information furnished

to the employer to an employee in connection with the waiver." *See id.* §§ (a)(2)—(3).

Plaintiff asserts that information provided to him prior to the waiver was misleading and fraudulently induced him to waive his ADEA claims. Specifically, he contends that McGraw–Hill's statement that his termination was the result of a reorganization was misleading. However, the evidence adduced in support of this motion reveals precisely the contrary.

■ An examination of the organizational charts of the business before and after the allegedly pretextual reorganizations reveal real and substantial differences. *Compare* Sheridan Aff., Exh. 8 *with* Sheridan Aff., Exh. 7. For example, three co-equal "Controller" positions were created to be responsible for the different business units, all of whom reported to the "Group Controller". *See* Sheridan Aff., Exh. 8. This is in contrast to the prior organization, which did not have a controller position to support the general manager of each retail unit. *See* Sheridan Aff., Exh. 7.

Plaintiff does not dispute that in late 1997 the retail services division of S & P changed considerably through combination, reorganization, and acquisition. Defendant maintains that the financial support staff for these units was thus correspondingly reorganized to better support the work of the organization. Plaintiff presents no evidence at all to call into question the apparent business logic of that explanation. Moreover, plaintiff admits that he does not know the results of the 1998 reorganization or the structure of S & P after he left the company. *See* SOUDF, ¶ 64. Thus, any claim that he was misled is not grounded in any specific knowledge that the reorganization was a sham, nor has discovery produced any such specific evidence.

Plaintiff's apparently sincere belief that his termination was the product of unlawful discrimination is insufficient to support an allegation of fraudulent inducement

when no other evidence supports this claim. *See* Sheridan Aff., 15–16. Indeed, allowing such a belief to invalidate a waiver precludes the possibility of ever having an enforceable waiver of discrimination claims.

An examination of plaintiff's argument reveals that the rule that he would have this Court apply would in essence require an employer to confess to unlawful discrimination before a valid waiver of ADEA claims could be executed. Otherwise, without such a confession, *any* waiver would be based on misleading information and thereby fraudulently induced. Such a reading is both illogical and unsupported by the statutory policy. The statute is designed to ensure that all waivers are counseled so that an employee understands his possible causes of action, has adequate time to consider the alternatives, and receives consideration in return for relinquishing possible claims.

Nothing in the statutory language indicates that this is a full disclosure statute, and no court has interpreted it as such. Nearly all the authority cited by plaintiff in which courts invalidate ADEA waivers involve circumstances where employers did *not* comply with the specific requirements of the OWBPA. *See, e.g., Oubre,* 522 U.S. at 427–28, 118 S.Ct. 838 ("Since Oubre's release did not comply with the OWBPA's stringent safeguards, it is unenforceable as it purports to waive or release her ADEA claim."); *Tung v. Texaco,* 150 F.3d 206, 209 (2d Cir.1998) (Employer failed to follow specific statutory requirement, § 626(f)(1)(H)).

The only case cited in which a court called into question a waiver executed in compliance with the OWBPA is *EEOC v. Johnson & Higgins,* 5 F.Supp.2d 181 (S.D.N.Y.1998) (Sand, J.). In that rather extraordinary case, however, employees alleged that they were coerced into waiving

back-pay claims in excess of $3 million in exchange for $1,000 in consideration. *See id.* at 183. Here, no such allegation of coercion is supported.[3] More importantly, Judge Sand and others have adopted the approach that after examining a waiver's validity under the statutory framework established by the OWBPA, a court may then look to background principles of contract law for guidance in unusual cases. *See id.* at 186; *Reid v. IBM,* 1997 WL 357969 (S.D.N.Y.). In this case, no traditional contract law analysis would find fraudulent inducement into this waiver, in light of the actual and meaningful reorganization of S & P Retail Finance Services that occurred in 1998 and the manifestly voluntary circumstances of the waiver.

■ Thus, we find plaintiff's ADEA claims barred by his waiver and release of claims. Similarly, his causes of action based on New York State and City law are barred by the agreement. As Judge Sweet observed in *Branker v. Pfizer,* 981 F.Supp. 862, 867 (S.D.N.Y.1997), the New York State and New York City age discrimination statutes are not governed by the OWBPA.

■ However, given that the waiver here has met the arguably more exacting standards of that statute, it undoubtedly is knowing and voluntary under the pre-statute "totality of the circumstances" test established in *Bormann. See Bormann,* 875 F.2d at 399, 402; *Johnson & Higgins,* 5 F.Supp.2d at 183 (noting that post-statute analysis of an ADEA waiver proceeds from the arguably more stringent statute, even though it essentially codified the common law test). Thus, for the reasons outlined in the discussion of the ADEA claim, we find summary judgment for the defendant on the state and municipal claims is also appropriate.

---

3. Indeed, plaintiff admits that he had suspicions that age discrimination played a role in his termination long before it occurred, but chose not to investigate those concerns but rather accepted the waiver of claims and the accompanying cash payment. *See* SOUDF, at ¶¶ 65–66.

## CONCLUSION

For the foregoing reasons, defendant's motion is granted, and summary judgment is entered in favor of the defendant. The Clerk of the Court is respectfully directed to close this case.

**IT IS SO ORDERED.**